**UNITED STATES of America,**
**Plaintiff,**

v.

**John Charles ALLEN and Anthony Craig**
**Federici, Defendants.**

**No. CR–71–431.**

United States District Court,
N. D. California.

Oct. 11, 1972.

James L. Browning, Jr., U. S. Atty., by James A. Bruen, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

James F. Hewitt, Federal Public Defender by John W. Keker, Asst. Federal Public Defender, San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION TO SUPPRESS AS TO INDICTMENT AND DENYING MOTION TO SUPPRESS AS TO REVOCATION OF PROBATION

SPENCER WILLIAMS, District Judge.

### I. FACTS

John Charles Allen plead guilty to violation of Title 21 U.S.C. § 331, possession of LSD, and on August 27, 1971 was placed on probation for a period of three years.

On July 7, 1972 Mr. Allen was arrested by Federal authorities at the San Francisco International Airport after a search of his bag uncovered 10,000 tab-

lets of LSD and approximately 2 grams of Tetrahydrocannabinolis ("hashish"). On July 19 he was indicted by the grand jury on charges of possession of these controlled substances, and on July 23 the Supervising Probation Officer petitioned the court for the revocation of Allen's probation on the grounds that by attempting to leave the jurisdiction without authorization and by having in his possession a controlled substance, he violated conditions 1 and 4 of the court's order granting probation.

Defendant moved to suppress the evidence obtained in the search described above and it was stipulated between counsel that the revocation hearing would be heard simultaneously with that motion.

On August 18, the court heard testimony regarding the search by customs security officers. The Supervising United States Probation Officer testified as to Mr. Allen's probation record.

The events surrounding the search are as follows: Mr. Allen checked his suitcase at the TWA counter, picked up his ticket (made out in the name of Adams), and proceeded to Gate 59. After presenting his ticket and entering the holding area, he was asked for identification by the airline ticket agent who noted he fit the "hijacker profile". Allen failed to produce any identification, whereupon the agent summoned the customs security officers. The officers administered a magnometer test upon Mr. Allen, which registered a slightly positive reaction. They then asked him if he was carrying any large metallic objects. Allen answered "no", but the agents asked if he would submit to a "pat down" search. Allen acquiesced. The agents found a wallet in his jacket bearing the identification of Allen's brother, Jessie, a fact that Allen had some difficulty explaining both to the officers at the time of the search and to the court at the time of the hearing. The agents then advised Allen that he would not be allowed to board the plane

and directed him to stand at a designated area near the jetway while they supervised the inspection of the remainder of the passengers. Thereafter, they led him to the Customs Office, administering the *Miranda* warning on the way. Allen's previously checked suitcase was brought to the office [1] at which time the agents asked for his consent to open it. Allen replied, "There are no weapons in there. I don't see why you need to look in the bag." The agents then called several law enforcement agencies in an attempt to discover Allen's true identity and whether he had a criminal record. Allen testified that at this point the agents told him that the local authorities would ultimately open the bag and that, "If you open it up we'll be able to get this thing straightened out, and you can go." Allen testified that he believed his options at that point were to either open the bag or be arrested. He then consented to the search and the officers found the contraband described above. Allen was again administered the *Miranda* warning and placed under arrest.

The Probation Officer testified as to Allen's probation record, which proved far from exemplary. When placed on probation, Allen was thoroughly advised of the obligations and duties as a probationer. He indicated his desire to return to his parents' home in Lake Zurick, Illinois. The Probation Office made arrangements to transfer his file to the Chicago office, but on September 20 Allen contacted the Chicago office and stated that he intended to stay in Illinois for only about 30 days and then return to California. As a result, the Chicago office declined to accept the transfer and so notified the San Francisco office which awaited word from Allen upon his return. Neither office received word from or about Allen for seven months when, on April 12, 1972, Allen's father contacted the San Francisco office by letter, stating he would be returning to California within a few days. Allen again failed to appear, and despite

---

1. It should be noted that by this time the jet Allen intended to board had departed.

the efforts of California probation officers to contact him, the San Francisco office received no information on Allen's whereabouts until the day after his arrest at the airport.

## II. MOTION TO SUPPRESS EVIDENCE IN CRIMINAL ACTION

The motion to suppress is based on lack of probable cause and absence of consent.

### A. Probable Cause

 It has long been held that searches conducted without a valid search warrant are *per se* unreasonable, unless coming within one of the few specifically established and well delineated exceptions. Katz v. United States, 389 U.S. 347–357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). When a warrantless search is questioned, the government has the burden of showing that it was permissible within one of the established exceptions. United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

 While one's conformity to the air "hijacker profile" has been approved as a basis for requesting a consent "pat search", United States v. Lindsey, 451 F.2d 701 (3rd Cir. 1971), United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y. 1971), it does not in and of itself constitute probable cause for a personal or baggage search. Furthermore, while Allen could have been denied passage on the flight due to the combination of his conformity to the profile, the inadequate explanation of his possession of a ticket made out to another person, and the possession of another person's I.D., these alone do not constitute facts and circumstances sufficient to justify a warrantless search.

· · · · · ·

### B. Consent

 The testimony of both the customs agents and Allen made it clear that at no time after the initial inquiry and detention did Allen have reason to believe he was free to leave the airport. The officers explained that while they had administered the *Miranda* warning to Allen as they escorted him from the boarding area to their office, in their view he was not actually placed under arrest until the contraband was discovered in the suitcase. Although Allen ultimately uttered words of assent to the request by the officers to open the bag, his acquiescence came only after repeated requests by the agents accompanied by references to the inevitability of a search by the local authorities. Allen testified he viewed his options as being either to open the bag or face immediate arrest.

Under these circumstances, the authorities leave no doubt that Allen's consent did not constitute an "intentional relinquishment . . . of a known right" to refuse to open the bag in the absence of a search warrant. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), Schoepflin v. United States, 391 F.2d 390 (9th Cir. 1968). See, also, Cipres v. United States, 343 F.2d 95 (9th Cir. 1965), where under almost identical facts defendant's submission to a search of her bag was held not to constitute a voluntary and intelligent waiver of her rights under the Fourth Amendment.

 Nor can it be held Allen's consent to a search of his bag was implied by his having presented himself for boarding. This proposition was recently rejected by the District Court in the Eastern District of New York in the case of United States v. Lopez, *supra*, which held that any doctrine of "implied consent" would be at odds with the strict standards of waiver enunciated by the Supreme Court. While this court has no doubt that airline authorities have an absolute right to require a passenger to submit to a search of his person and baggage *as a condition* to boarding the aircraft, it accepts the conclusion reached in *Lopez* that in order to be a valid waiver of Fourth Amendment rights a passenger must be aware of his option to avoid the search by not boarding.

Thus, since the search was not based on either probable cause or voluntary consent, the evidence found resulted from an illegal search and must be suppressed for purposes of the criminal action against Allen. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652 (1914).

## III. MOTION TO SUPPRESS EVIDENCE AT HEARING ON REVOCATION OF PROBATION

As noted above, the Probation Office based its petition for revocation on two grounds—that Allen was found in possession of controlled substances and that he attempted to leave the jurisdiction without first notifying his Probation Officer. The Probation Officer, however, testified that such a petition would probably not have been made on the latter charge alone, and it was upon the evidence of criminal activity that it decided to petition for the revocation of Allen's probation. But regardless of the basis for the probation department's petition to the court, it is the court, not the department that must evaluate the record of the probationer and determine whether his probation should be continued, modified, or revoked. Title 18 U.S.C. § 3653.

Allen argues that since the evidence was unlawfully seized it should be excluded from this court's consideration of the petition for revocation. The court disagrees. The primary objective of probation is the protection of society through the rehabilitation of the offender. Probation is not an act of leniency. Its purpose is "to provide an individualized program offering a young or unhardened offender an opportunity to rehabilitate himself without institutional confinement under the tutelage of a probation official and under the continuing [jurisdiction] of the court to impose institutional punishment for his original offense in the event that he abuse the opportunity." Roberts v. United States, 320 U.S. 264, 272, 64 S.Ct. 113, 117, 88 L.Ed. 41. The judgment of the sentencing court is at best a calculated risk based on the court's belief that the offender is suitable for rehabilitation through return to the community under probation supervision. Such a belief is founded on many factors, some tangible, some rather intangible. And when it developes that the Judge's confidence has been misplaced, prompt steps may be taken to protect both the public, and the probationer.

It has long been held that the probation revocation is not a formal trial, United States v. Bryant, 431 F.2d 425 (5th Cir. 1970); United States v. Sutton, 421 F.2d 1394 (5th Cir. 1970), and that normal procedure and evidentiary rules governing criminal trials are not required at such hearings. See also, Arciniega v. Freeman, 439 F.2d 776 (9th Cir. 1971), holding that hearsay evidence is admissible and that there is no right to cross examination at parole revocation hearings. The degree of proof necessary for probation revocation is less than required to sustain a conviction. United States v. D'Amato, 429 F. 2d 1284 (3rd Cir. 1970); United States v. Nagelberg, 413 F.2d 708 (2nd Cir. 1969). All that is required is that the evidence and the facts be such as to reasonably satisfy the Judge that the conduct of the probationer has not been as creditable as required by the conditions of probation. Manning v. United States, 161 F.2d 827, 829 (5th Cir. 1947).

This court can find neither compelling reasons nor legal precedent for applying the exclusionary rule to revocation hearings. The accepted purpose of its application to criminal proceedings is to "deter the police from illegal searches and seizure", Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). No similar argument has been advanced in this case, and the court is unaware of any existing or threatened abuse that must be deterred. Neither the Congress nor the judiciary is powerless to afford a remedy, be it the exclusionary rule or something more satisfactory, should abuses compel such action. For the present, however, the more im-

portant question is whether the probationer is satisfactorily pursuing his rehabilitation and, if not, what appropriate steps should be taken to assure that he will. Furthermore, to burden revocation proceedings and possibly other aspects of the probation system with technical procedural and evidentiary rules similar to those required at the pre-trial and trial phases of our criminal justice system would be counter-productive, compelling a substantial redirection of probation's limited manpower away from important supervision and counselling services.

The Ninth Circuit has yet to pass on the precise question of whether the exclusionary rule applies to probation revocation proceedings. However, at least one other jurisdiction has expressly held that it does not, United States ex rel. Lombardino v. Heyd, 318 F.Supp. 648 (E.D.La.1970), and other courts have similarly held in analogous parole revocation situations. United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2nd Cir. 1970), In re Martinez, 1 Cal.3d 641, 83 Cal.Rptr. 382, 463 P.2d 734 (1971).

Defendant contends the exclusionary rule should be applied here under the authority of Verdugo v. United States, 402 F.2d 599 (9th Cir. 1968). There the court held that unlawfully seized contraband could not be considered by the district court at the time of sentencing. In reaching that decision the court noted the highly concentrated nature in which narcotics law enforcement is necessarily practiced, the familiarity of agents with past violators and current suspects, and the physical danger involved in making arrests and concluded that officers of the Federal Bureau of Narcotics had a *personal stake* in seeing not only that a violator was convicted, but also that he receive a lengthy sentence. Thus, the court reasoned, in the absence of the exclusionary rule, an officer would have an incentive, given the proper circumstances, to lawfully obtain only so much evidence as is necessary to assure conviction of the defendant of a single offense, and then proceed to unlawfully obtain evidence of additional offenses which would ensure a long sentence.

These factors are not present in the instant case. The arresting officers here were customs officials. Unlike narcotics officers who sometimes keep a particular suspect under close surveillance for weeks prior to making an arrest, custom officials are not likely to have independent knowledge of prior illegal activities of persons they detain, and certainly in the normal course of events would have no idea the suspect is on probation. In short, there is no particular incentive on the part of agents in the present situation to purposely abuse the Fourth Amendment rights of persons they detain. As stated in Verdugo v. United States, *supra*, at p. 611, the Supreme Court has implied that "relaxation of the exclusionary rule [is appropriate] when its enforcement would have no deterrent effect or the deterrent effect would be insubstantial." Such is the case here.

The court therefore holds that the exclusionary rule does not apply so as to exclude from a probation revocation hearing evidence seized in violation of the Fourth Amendment, finds that Allen has violated conditions 1 and 4 of the order granting probation, determines that institutional confinement is probably necessary to effect desirable rehabilitative progress, revokes Allen's probation and commits him to the custody of the Attorney General for a study and report under 18 U.S.C. § 5010(c).